UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JEREMY FRANCIS AND                    CIVIL ACTION NO. 09-cv-0425
DEIDRA FRANCIS

VERSUS                                MAGISTRATE JUDGE HANNA

GRT UTILICORP, INC. AND               BY CONSENT OF THE PARTIES
DP MANUFACTURING, INC.


## MEMORANDUM RULING


Currently pending before the Court is a motion to exclude the testimony at trial

of the plaintiff's engineering expert, Dr. William Singhose, and the plaintiffs's human

factors and warnings expert, Dr. Robert Cunitz, which was jointly filed by the

defendants, GRT Utilicorp, Inc. and DP Manufacturing, Inc.  (Rec. Doc. 90).  A

hearing was held at which Dr. Singhose testified. The remainder of the evidence was

submitted with the briefs of the parties.


### I.    FACTUAL  BACKGROUND

This lawsuit arises out of a workplace accident that occurred on February 11,

2008.   At that time, plaintiff Jeremy Francis was employed by Highway

Technologies, Inc. and working as a laborer on a crew that was replacing guardrails

on a highway near Winnfield, Louisiana.   To accomplish this task, Highway

Technologies used a truck-mounted post driver to set and remove the vertical I-beams to which the horizontal guardrails are then mounted.  A hydraulic arm extends out past the end of the truck and up into the air.  A "rail" or "rail assembly," into which an I-beam can be placed, extends from the top of the arm to the ground.  An "adaptor cap" or "anvil adaptor" fits onto the top of the I-beam.  When a post is driven, a 1,250 lb. weight or "hammer" drops and strikes the top of the adaptor cap in order to drive the I-beam into the ground.  Where the I-beam meets the ground, there is a "footer" or "foot adaptor" that latches onto the I-beam and holds it in place so that the post goes into the ground at the correct angle.

On the day of Francis's accident, the crew was using a post driver that was designed and manufactured by defendant DP Manufacturing, Inc. and sold by DP to Work Zone, the predecessor of Highway Technologies, in 1992.  Work Zone was succeeded by United Rentals.  In 2006, United Rentals obtained a quote from defendant GRT for repairs to this post driver.  GRT undertook the repairs and, in May 2007, GRT returned the post driver to United Rentals.  United Rentals was then succeeded by the machine's current owner, Highway Technologies.

During the extensive repair process, GRT reverse engineered and manufactured two parts for the machine:  an anvil and an adaptor cap.  GRT also repainted the

machine and affixed warning stickers to it.  GRT also placed a sticker on the machine

identifying GRT as the machine's manufacturer.

On the day of the accident, Francis and Byron Alexander, the post driver

operator on his crew, were having trouble setting a post.  The post was going into the

ground at an angle, so they decided to pull it out and start over.  After multiple

attempts to get the post out of the ground, Alexander told Francis to go get some

chains out of the truck so that they could finish the job.  As Francis was on his way

back, the post ejected from the machine, striking Francis in the face and causing

severe injuries.

The plaintiffs contend that GRT and DP are liable for causing Francis's

accident and injuries because the post driver was unreasonably dangerous under the

Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 *et seq*.  More

specifically, utilizing the opinion of Dr. Singhose, the plaintiffs contend that the post

driver was unreasonably dangerous in design because it lacked a chain or bar to act

as a redundant safety device to prevent an I-beam from being ejected from the

machine.

Utilizing the opinions of Dr. Cunitz, the plaintiffs also contend that the post

driver was unreasonably dangerous because there was no warning that a beam could

be ejected from the machine; because there was no warning that the adaptor cap and

foot adaptor, which are critical safety features, should have been replaced only with

parts manufactured by DP, the original equipment manufacturer;[1] and because the

warning that was given – cautioning that a person should not stay within ten feet of

the machine while it was in use – was inadequate.

## II.   LAW AND ANALYSIS

Under Louisiana law, the manufacturer of a product can be found liable only

for damage:  (a) proximately caused by a characteristic of its product; (b) if that

characteristic renders the product unreasonably dangerous; and (c) when the product

is used in a reasonably anticipated manner.[2]   A product can be unreasonably

dangerous only if (a) the product is unreasonably dangerous in construction or

composition; (b) the product is unreasonably dangerous in design; (c) the product is

unreasonably dangerous because an adequate warning about the product was not

provided; or (d) the product is unreasonably dangerous because it does not conform

---

[1]      Such parts are referred to by the parties in their briefing as "OEM" or "OEM parts" because the initials "OEM" sometimes stand for "original equipment manufacturer."  Given the context used by the parties, the Court understands this acronym to refer to replacement parts that are manufactured by the manufacturer of the original part.  See, e.g., "[w]hen referring to automotive parts, OEM designates a replacement part made by the manufacturer of the original part." Wikipedia, http://en.wikipedia.org/wiki/original_equipment_manufacturer (last visited Jan. 31, 2013).

[2]      La. R.S. 9:2800.54(A).

to the manufacturer's express warranty.[3]  In this case, the plaintiffs contend only that the post driver is unreasonably dangerous in design and for lack of adequate warnings.

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:  (a) there existed an alternative design for the product that was capable of preventing the claimant's damage; and (b) the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer associated with adopting the alternative design and outweighed the adverse effect, if any, of the alternative design's effect on the utility of the product.[4]

A product is unreasonably dangerous for inadequate warning if, at the time the product left its manufacturer's control, the product possessed a characteristic that might cause damage and the manufacturer failed to use reasonable care to provide an adequate warning about that characteristic and its danger to the product's users and handlers.[5]  The LPLA defines "adequate warning" as "a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the

---

[3]      La. R.S. 9:2800.54(B).

[4]      La. R.S. 9:2800.56.

[5]      La. R.S. 9:2800.57(A).

-5-

danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made."[6]

The characteristic of a product that renders it unreasonably dangerous due to a design defect or inadequate warning must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.[7] The establishment of each LPLA element is a question of fact for the jury to determine.[8]

DP contends that its post driver was not unreasonably dangerous as originally manufactured because its original adaptor cap was designed in such a way that the I-beam could not have been ejected from the machine under any circumstance.  While it is not clear exactly what caused the I-beam to eject, it is clear that the adaptor cap did not hold it in the machine, and it is undisputed that there was no redundant safety device, as described by Dr. Singhose. to preclude, or at least limit, the possibility of a post being ejected.

---

[6]   La. R.S. 9:2800.53(9).

[7]   La. R.S. 9:2800.54(C)

[8]   *Matthews v. Remington Arms Co., Inc.* 641 F.3d 635, 641 (5th Cir. 2011), citing *Ellis v. Weasler Engineering, Inc.* 258 F.3d 326, 331-32 (5th Cir. 2001).

DP's expert, Dr. Whitehouse, testified that the adaptor cap was one of two critical safety component parts of the machine and if these two parts were not used during the operation of the post driver, then the post driver lacked a safety device that would prevent a post from being ejected.  He also testified that, in the post driver industry, these caps were fabricated by third parties described as "mom and pop welding shops" on a "frequent basis" as they would wear out from the repetitive impacts.  However, there was nothing on the machine or in the operator's manual provided by DP that indicates the critical nature of using only OEM parts to assure the safe operation of the machine.

It is undisputed that GRT performed extensive repairs to the post driver before the accident including the fabrication of two component parts, one of which was the adaptor cap that was reverse engineered from the DP design.  DP's expert concluded that if GRT reverse engineered an adaptor cap that was consistent with DP's design, as GRT contends, then that adaptor cap was not on the post driver when it was inspected after the accident occurred.[9]  The plaintiffs have evidence to suggest that the adaptor cap fabricated by GRT was on the machine at the time of the accident.

If the adaptor cap fabricated by GRT was identical to the design of DP and it was on the machine at the time of the accident, that would dispute DP's contention

---

[9]        Rec. Doc. 103-14 at 6.

that its adaptor cap was designed such that an ejection of the post could not occur. If the adaptor cap was different and did not conform to DP's original design, there is a factual issue for the jury concerning whether the adaptor cap on the post driver at the time of the accident was a reasonably anticipated alteration or modification of the machine.

In addition, it is undisputed that GRT placed some warnings on the machine at the time of the repairs, and there were warnings that were contained in the DP operator's manual.   Whether a product is unreasonably dangerous due to an inadequate warning is a question for the trier of fact.[10]   Therefore, a factual question for resolution by the jury is whether these warnings were "adequate," and the plaintiff offers Dr. Cunitz to opine that they were not.

With regard to any potential expert witness, "[b]efore certifying an expert and admitting his testimony, a district court must ensure that the requirements of Federal Rule of Evidence 702 have been met."[11]   Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[10]   *Brooks v. State ex rel. DOTD*, 10–1908 (La. 07/01/11), 74 So.3d 187.

[11]   *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012).

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

The defendants do not seriously challenge the credentials of either expert. Rather, the focus of both attacks is primarily aimed at the reliability of the experts' methods and principles, and in the case of Dr. Cunitz, whether it will assist the trier of fact.


**Dr. William Singhose**

Dr. Singhose holds a Ph.D in Mechanical Engineering and is currently serving as a professor at Georgia Tech in that field.  His experience includes the mechanical design of  components for heavy machinery and systems that manufacture heavy machines.[12]   He has authored engineering textbooks and technical papers on mechanical engineering and design.

Dr. Singhose testified regarding the engineering principles he followed to arrive at his conclusion and provided the support for those principles from other

---

[12]      Rec. Doc. 148, p. 7.

texts.[13]   The hazard that the post could eject from the machine resulting in catastrophic harm was identified as foreseeable based on his review of the evidence in this case, the reports of a similar incident in another case, and applying a risk assessment procedure from an engineering textbook.[14]   The next step in the engineering analysis was to find a solution to that problem, so he looked at patents involving different post drivers which contained redundant safety devices, and after consultation with an engineering team, he opined that these would be a potential solution to the problem he identified.[15]   The last step in the analysis, if no solution could be found, was to consider conceptual designs with prototypes or possibly a warning.[16]   He did not conduct that analysis since he felt he had found an acceptable solution and he did not feel this type of catastrophic event could be adequately warned against given the design of the post driver based on the engineering literature.[17]   In short, Dr. Singhose's methods and the theories utilized to reach his conclusions could be tested against standard, reliable, published engineering analysis principles which have been accepted in his scientific community.  This Court offers

---

[13]     Rec. Doc. 148, pp. 8-23, 36-38.

[14]     Rec. Doc. 148, pp. 36-37.

[15]     Rec. Doc. 148, pp. 13-20, 37.

[16]     Rec. Doc.148, p. 37-38.

[17]     Rec. Doc. 38.

no opinion as to the ultimate conclusion he reached as that conclusion is within the province of the finder of fact.

This Court finds that the testimony of Dr. Singhose will be of assistance to the trier of fact. Further, the methods of engineering analysis applied by Dr. Singhose are reliable methods that are generally accepted in the technical community, and there are sufficient facts or data to support his opinions. While the weight ultimately given to his opinions may be impacted by vigorous cross-examination by the defendants, the issues raised in the cross examination at the hearing do not require his testimony to be held inadmissible. Therefore, the motion as it applies to Dr. Singhose will be denied.

## Dr. Robert Cunitz

Dr. Cunitz holds a Ph.D in Experimental and Human Factors Psychology. He is a "Human Factors Psychologist specializing in the area of the safety of the interaction of people with products as they are used in the real world."[18] He attached to his initial report a bibliography of some of the published, peer-reviewed articles on the subject of warnings that he has read during his career which were used to develop the principles that formed the methodology he utilized to evaluate the

---

[18]    Rec. Doc. 90-3, p. 2.

warning in this case.[19]  Those principles were also "generally used" to prepare a peer-reviewed paper Dr. Cunitz authored in 1990 entitled "Warnings: A Human Factors Perspective."[20]   According to Dr. Cunitz, this paper set forth "the essential methodology that human factors specialists utilize to analyze warnings," and he used the criteria from that paper "to analyze the warning systems, or lack thereof, in this case."[21]

> Dr. Cunitz stated in his initial report:
>
> Because of the high degree of specialized knowledge that I have in the fields discussed above, and the amount of experience I have in evaluating and designing warnings, my assessment of the warnings in this case in light of the well-accepted framework outlined in the article attached is reliable.
>
> .      .      .
>
> My opinions are based on my experience, education, and training. Further, my opinions are based on my analysis, evaluation and review of all the evidence presented to me in this case. My opinions are provided with a reasonable degree of certainty within my field of Human Factors Psychology.   My opinions were formed after applying the methodologies and criteria previously described."[22]

---

[19]     Rec. Doc. 90-3, pp. 2-3.

[20]     Rec. Doc. 111-2, p. 36.

[21]     Rec. Doc. 90-3, p. 10.

[22]     Rec. Doc. 90-3, p. 22.

Dr. Cunitz issued six opinions in his initial report.[23]   The first is that "the hazard posed by the pressure driver forcibly ejecting steel posts was known or should have been known to GRT Utilicorp, Inc. and DP Manufacturing, Inc. when the pressure driver was designed, manufactured and sold."[24]  This Court can find nothing from the discussion of the cited materials that would indicate that this is an opinion based in Human Factors Psychology, its applicability to warnings, or any discussion of how the methodology utilized by human factors specialists would apply to this opinion.  Unless Dr. Cunitz can demonstarte to this Court how the methodology applies, he will not be permitted to testify to this opinion.

The second and third opinions also have nothing to do with warnings and primarily amount to an agreement with Dr. Singhose's opinions that the post driver was defective in design (opinion three) and that a hazard, once identified, be eliminated if possible (opinion two).  Dr. Cunitz admittedly is not qualified to render an opinion regarding a design defect as it is outside of his specialty.  As a result, Dr. Cunitz will not be permitted to testify as to this opinion.  With regard to the hierarchy of safety techniques (opinion two), Dr. Cunitz will be permitted to testify to this

---

[23]     Rec. Doc. 90-3, pp. 22-23.

[24]     Rec. Doc. 90-3, p. 22.

opinion to the extent it involves where a warning might fit in to that hierarchy, subject to the limitations below.

The fourth and sixth opinions deal with the warnings in this case and the superior positions of knowledge held by manufacturers over end users regarding the hazard of a product which would necessitate warnings.  Dr. Cunitz concludes that none of the warnings and labels on the machinery addressed the hazard that ultimately occurred, the post being ejected, nor did any warnings or labels provide any instruction necessary to avoid injury even though they could have and should have.[25] What he did not clearly say, either in his report or his deposition, is how any of the authorities cited in his report, as well as some he "had in his mind" that were not in his report, supported his conclusions.

In the recent decision of *Brown v. Illinois Central Railroad Co.,*[26] the Fifth Circuit affirmed the exclusion of an expert's testimony when the expert did not articulate a credible methodology to sustain his conclusions, relying instead on his "education and experience."  The court, citing *Moore v. Ashland Chemical, Inc.* 151 F.3d 269, 276 (5th Cir. 1998) (footnotes and citations omitted), stated:

---

[25]    Rec. Doc. 90-3, p. 23.

[26]    No. 11-60654, 2013 WL 322213, at *3 (5th Cir. Jan. 28, 2013).

To establish reliability under *Daubert,* an expert bears the burden of
furnishing "some objective, independent validation of [his]
methodology."  "The expert's assurances that he has utilized generally
accepted [principles] is insufficient."  In this case, Long professed to
base his findings on the standards and customs of the transportation
engineering profession.  To that end, his preliminary report mentioned
a variety of public and private guidelines and publications on roadway
design and traffic control devices.  However, the report failed to explain
how any of these authorities support Long's conclusions relating to the
"narrow" pavement, "skewed" angle, "rough" surface, and "steep"
incline of the Hartley Lane crossing. . .  Apparently recognizing the lack
of objective support for his findings, Long emphasized his own
"education and experience," urging that "[c]ontrary to some thinking,
standards related to safety do not always have to be adopted by some
official agency in order to exist."  But we have long held that "[w]ithout
more than credentials and a subjective opinion, an expert's testimony
that 'it is so' is not admissible."  Long's analysis is transparently
subjective and the district court did not abuse its discretion by excluding
his testimony.

Dr. Cunitz was not called to testify and his deposition excerpts do not

adequately explain to this Court where, if at all, the standard of *Brown* is met in his

report.[27]  In point of fact, much of Dr. Cunitz's report was "generic" and admittedly

was not specific to this case.[28]  However, this Court recognizes that it is conceivable

that the methodology is contained within the report and yet is not apparent.

Therefore, the motion as it applies to opinions four and six will be denied without

---

[27]    See for example, Rec. Doc. 90-5, pp. 24-26.

[28]    Rec. Doc. 90-5, p. 27.

-15-

prejudice to the defendants' right to re-urge their objection outside the presence of the jury at the time of trial.

As to opinion five, Dr. Cunitz will not be allowed to opine on the ultimate conclusion that the pressure driver was unreasonably dangerous as that conclusion is within the province of the jury.

In his supplemental report which was issued after the reports and depositions of the defendants' experts, Dr. Cunitz opined that there should have been a warning that only OEM parts were to be used if a part of the post driver needed to be replaced and the failure to replace that part with an OEM part would compromise a critical safety function of the machine.[29]  He also opined that the machine's warning to stay at least ten feet away was confusing and meaningless, and therefore inadequate, because it is necessary for a worker to be near the machine at certain points in the post driving process.[30]  These opinions suffer from the same deficiency as the opinions in his initial report, and therefore, the motion will be denied without prejudice to the right of the defendants to re-urge their objections at the time of trial outside the presence of the jury.

---

[29]    Rec. Doc. 90-4, p. 2.

[30]    *Id*.

The defendants also object to the "supplemental" nature of the report as being made outside the deadlines and that it was in the nature of "gamesmanship."  Fed. R. Civ. P. 26(e) allows for supplementation.  Dr. Cunitz testified that he had a personal medical issue which delayed the production of the supplemental report.  However, after the report was produced, the defendants were able to depose Dr. Cunitz on the information contained in his supplemental report.  Therefore, in the absence of prejudice, the Court will not exclude the opinions contained in the supplemental report on this basis.

The Court notes that "[t]he adequacy of a warning is a factual issue which the jury can handle without expert help from either side."[31]  Based on the record before the Court at this time, it is conceivable that Dr. Cunitz's anticipated testimony may not be required to assist the jury in determining whether a warning should or should not have been provided with regard to the danger of post ejection or the need for using OEM replacement parts on the post driver.  The Court specifically does not exclude the option to find that the members of the jury will be able to make these factual determinations on their own without expert assistance depending upon the facts adduced at trial.

---

[31]     *Murphy v. Ford Motor Co., Inc.*, 2009 WL 2969905, at *2 (W.D. La. Sept. 14, 2009), quoting *Calvit v. Procter & Gamble Mfg. Co.*, 207 F.Supp.2d 527, 529 (M.D. La. 2002).

Accordingly,

IT IS ORDERED that the motion (Rec. Doc. 90) is GRANTED IN PART with regard to Dr. Cunitz, and Dr. Cunitz will not be permitted to testify at the trial of this matter as to some of his opinions as set forth herein.  The motion is DENIED IN PART, without prejudice to the right of the defendants to re-urge the motion at trial, to be heard outside the presence of the jury, as set forth herein.

IT IS ORDERED that the motion (Rec. Doc. 90) is DENIED with regard to Dr. Singhose.   Nothing is this ruling prohibits the defendants from making contemporaneous objections at trial concerning the lack of a factual basis for the opinions of either expert.

Signed at Lafayette, Louisiana, this 25th day of February 2013.


PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE